L.R. v. School District of Philadelphia Mr. Scott, good morning. Your Honor, good morning. Good morning, everyone. My name is Jeffrey Scott. I'm from the law firm Archer & Greiner, and I'm here and I represent the estate of Reginald Littlejohn and the School District of Philadelphia in this appeal. This is, and we'd like to reserve two minutes, Your Honor, for rebuttal. This is an appeal from a denial of a qualified immunity in a state-created danger case involving a school child in the School District of Philadelphia. Like all state-created danger claims, not all but almost all, the outcome, or what happens to the person who was harmed by the third party, is usually horrific, and in this case... It's usually what? Horrific, Your Honor. Tragic. And in this case, it's not much different in this case. There was a woman who, for whatever reason, came into the school, ended up targeting this young lady, ended up getting through security, ended up getting into the hallways. How old was the young lady? She was in kindergarten, Your Honor. And she ended up somehow taking the child out of the building and, according to the complaint, inflicted severe harm on this child later on. But we have to really put aside the outcome when we're deciding this issue of qualified immunity in the state-created danger claims because we have to look at what was in front of the state actor. In this case, it would have been the school teacher, Mr. Riljon. Mr. Scott, the appellee here says that you're not challenging either the first or third cause of that four-part test. Is that the case? Well, it's the case to the extent that I think our stronger arguments were the second prong and fourth prong. With regard to the prong regarding whether or not there was some relationship, and I don't mean a special relationship, I mean the prong involving was there some connection between the child and the school teacher and the school, of course there was some connection. So we wouldn't be able to make a good-faith challenge to that. I think our strongest arguments are whether or not under the facts, the legend, the complaint, that Mr. Riljon's actions were conscious shocking, and in this case it would have been deliberate indifference. And our second stronger argument, I think maybe our first stronger argument, is the fourth prong, which is was there affirmative conduct, affirmative action versus inaction on behalf of Mr. Riljon. Let's talk about your arguments on the second prong and to the extent you suggest you are still pressing the first, foreseeability. Perhaps they're related. But you seem to be arguing that the teacher here didn't actually know the perpetrator's intentions. That's correct. And which sort of ties in with the risk of harm and foreseeable harm. You seem to be requiring actual knowledge when the deliberate indifference standard, as we've articulated it, is something less than that, isn't it? Well, I think because this is a 14th Amendment case, I believe there was a district court case that mentioned the Karcher case, which indicated that there might be a difference in a case like this involving objective versus subjective. So I agree with the court that actual knowledge may not be definite. There has to be some facts that would give rise to something more than a reasonableness or an objective standard. It has to be more subjective. So our point on that is the complaint itself, the way it's written, does not give sufficient information to the schoolteacher at this point in time when a woman walks in and says, the complaint doesn't even say what she says, that there was some kind of nefarious role that this woman was going to play. So the complaint itself does not give rise to that fact, unlike the situation in, I'll go to Nipes, in Anthem-Nipe, where the officer who intervened in that situation, it was called outside and their circumstances. So we're clear you're not suggesting a requirement of actual knowledge. I don't believe that would be the standard. Okay. Now as to the nature of the risk and what is foreseeable, as to that, you seem to be suggesting there's a requirement of a level of specificity as to the type of physical or psychological harm that could befall a victim. Where in our cases do you find an articulation of the risk of harm with that level of specificity? It's not to that specificity, but there has to be sufficient information that would have allowed, without making a general inference, because it's a qualified immunity case, without making a general inference that something could happen, something bad could happen. There has to be additional facts, such as maybe if the complaint alleged that when the woman came into the school building, there was some kind of negative reaction from this child. Maybe there was something that was strange that this woman was doing and there was some strange interaction between this woman and child that would give a reasonable person, a schoolteacher, pause to think that there could be something strange going on here. But the way the complaint is worded now is completely devoid of those facts. Isn't the risk of harm one that's just obvious and common sense when it comes to turning over a small child to a stranger? I mean, whether it's apparent that the intended harm involves child trafficking or child pornography or assault or any range of the particular harms that could befall a child in that situation, doesn't our case law only require a risk of physical harm, as we've articulated it over and over, on the foreseeability and as tied up with deliberate indifference to what type of risk factors? The foreseeability would have to be tied in with the deliberate indifference standard. You have to look at the totality of the circumstance in front of the schoolteacher at this time, take into account what the facts in the complaint say, and there's no facts in the complaint that would give rise to what we believe is sufficient conscious shocking behavior because what you're doing now is you're basically speculating what horrible thing could happen without having enough specificity in the complaint itself that would give a reasonable teacher, under those circumstances, something to think something horrible like this is going to happen. Weren't the regulations on how a child would be permitted to leave the school drawn up with the thought of these horrible things that could happen? Having not drawn those up, I would have to agree with the court that the reasons why the policies would be in place could be several things. For example, we know that parents of children in schools have divorces. Some parents can't have custody, and those policies are there to make sure, and these aren't strangers, by the way. These are people who are known to the child. The policy would be drawn up to make sure the person who's receiving the child has authority to receive the child. But going back to the question, Your Honor, is that policy itself doesn't give rise to a constitutional duty on the part of little John. I'm talking about the awareness it would give to the teacher when he knows that there are these regulations in place. Why are they in place? Well, one of them is to prevent divorced parents from taking a child, but another thing is to prevent people from coming into the school and taking children to inflict harm on them. I think that's a reasonable statement. And would not Mr. Little John have been aware of those reasons when he permitted the child to go out of the school? Well, apparently Mr. Little John, according to his complaint, was aware of that policy because he attempted to use the policy, but he didn't follow through with the policy. That seemed to raise a very, very large red flag. When he's aware of the policy, he asks for identification, and the lady who took the child said, I don't have any, basically. He nonetheless gave the child to the lady who came to the school. Under the facts of the complaint, Your Honor. Isn't that a huge red flag in terms of foreseeability of harm? It's a huge red flag as to now that we know what happened, it's a foreseeability, but I would suggest to the court that under these facts, it's a potential for risk of harm. But under the facts, as I was speaking with Judge Krause, I don't think there's enough facts to give rise to that deliberate indifference. And so I understand where the court's going with the foreseeability. Well, he certainly was indifferent with regard to who that person was. But not following through and not checking with the office and not making sure with this person. And that is where we get into the crux of really where our qualified immunity argument really is. And that is what Mr. Littlejohn, what he did, was it inaction or was it action? And so when we look at the complaint, we see that Mr. Littlejohn failed to follow the school district policy. Mr. Littlejohn asked for verification or ID. The woman did not produce the ID. Do you think that turning over a five- or six-year-old child to a complete stranger in a school setting is action? I would not characterize what his conduct was as action. I would characterize what he did was he failed to do the things that he was supposed to do under the policy. Well, he failed, but then he did something. He turned the child over to the woman. He let the child go with the woman. He didn't take the child by the arm and say, no, you can't go with her. He did the opposite, Your Honor. He did not stop the woman from taking the child. But he did let her go. He failed to prevent. This is where we get into the semantics versus inaction versus action. But there was an active facet of what he did in that he permitted that child to go. But if the woman walked in and took the child, then the court's suggesting that that would be inaction and that wouldn't be actionable, and that would also be improper. So he asked her ID. He failed to follow through. The woman walked out of the school with the child, undisputedly. The fact that the complaint alleges that he released the child suggests that there was some level of custody, custody in the terms of a constitutional custody. Don't we have to, under Deshaney, in our cases, when we consider the line between nonfeasance and affirmative acts, we look at what the baseline was beforehand, right? We look at the state of affairs to determine whether the action or even inaction in a given situation actually created more vulnerability or created the very harm in question. So here, don't we need to account for the fact that we're dealing with a kindergarten class, and the baseline is that no kindergartner is going to be permitted to simply leave a classroom, walk out of the room, walk out of the school into the street. In this situation, at least with children of this age, the teacher really serves in a gatekeeper capacity. The question is, this case is not about a special relationship in terms of Deshaney. The parties, I understand your question, but this case is based on state-created danger. This Court has held over and over that there is no special relationship under Deshaney between a school child and a teacher, in fact, or a school district. Therefore, there's no duty to protect, just like in the case of a foster care or a person who's institutionalized or a person who's in prison. Well, that is a different issue, and we have not been asked to address a situation like a kindergarten room, where arguably, even in our advance decisions, we've suggested a situation where there was, in fact, a locked classroom, where there was that level of control, might lead to a finding of a special relationship. That's not the issue before us. That's correct. But yet, when it comes to identifying affirmative acts, we still look to that baseline to determine whether there was an increase in vulnerability or actual harm as a result of the alleged action or inaction. In a kindergarten room where a teacher serves in a gatekeeping role and does not permit five-year-olds to wander off out of the classroom or school grounds unattended, in that case, isn't the failure, as you characterize it, to prevent the child from leaving actually changing the baseline, creating more vulnerability and harm? Well, that would be creating, actually, new law, I think, in the Third Circuit. I think it would redefine a new circumstance. I think it would redefine the qualified immunity issue because there is no case on point that would have put Mr. Littlejohn on notice, and I don't believe Knight does, and I can discuss that, put Littlejohn on notice, that what you just said would create a new realm of a duty, whether it's under the shanning. Would it put him on notice that what he did was wrong? I'm sorry, Your Honor. It would not put him on notice that what he did in turning over the child was wrongful conduct? I think it may have put him on notice that it may have been, in my view personally and maybe the Court's view, improper, maybe unethical, maybe not even moral, but I don't think it would have put him on notice by failing to confirm this woman's I.D. and failing to prevent this woman from taking this child would give rise to a claim under the 14th Amendment. But this is a kindergarten student, which is just a step above daycare. I understand what the Court's saying, but I think there's not enough case law that would have put him on notice, such as Knight, because the difference between Knight and this case are a few things, and I see that in my times, and I request a little bit more, but I'd like to... We'll get you back on rebuttal. Because I think that it's very important for me to discuss the difference between Knight... Okay, we can do that on rebuttal. Okay. Mr. Becker? Good morning, Your Honors. May it please the Court, Chip Becker for the Plaintiff L.R. Is your father watching you carefully? He is. He is. The last time I was in the Court, Jeff Jambro asked me pretty much the same question, so that's the risk that I bear every time I walk into this room. We all know that the 14th Amendment is not a font of tort law, right? We know that it is exceedingly difficult to thread any needle when you're talking about Section 1983 claims, especially when you're talking about state-created danger, which does not represent a super-negligence theory. It's a very specific kind of claim that fits within the narrow box of a state-created danger claim. This happens to be one of those cases, at least in the current posture as it's fled in the complaint. And I hear Mr. Scott to be saying that he thinks that the facts are a little bit different. He used the word characterize. He used the word semantics. And those are all words that are in the nature of saying when I get to discovery, here I'm speaking as Mr. Scott, when I, Mr. Scott, get to discovery, I'm going to prove to the Court that, in fact, the case is different than as pled. But we're not at discovery. Right now we're on a motion to dismiss. That was their decision to file a motion to dismiss, and Judge Du Bois evaluated that motion against the allegations in the complaint. And those allegations are straightforward and clear and do place this case within the narrow box of state-created danger. There was deliberate indifference as pled. There certainly was an affirmative act as pled. And to the point, Judge Krause, that you were exchanging with Mr. Scott earlier, at this point they haven't really contested the other two aspects of the rubric of state-created danger, although they did explore that with Judge Du Bois. And as you know, Judge Du Bois wrote a very thorough and extensive opinion elaborating why, at least now, there's not a basis for qualified immunity and there's not a basis to dismiss the case. How can the facts pleading the complaint give rise to an affirmative act when the case law, including from the Supreme Court in this area, sets such a high bar? If child protective services turning Joshua back over to his father was not an affirmative act and didn't create a danger for purposes of liability there, how is this distinguishable? Well, we also understand that the difference between action and failure to act can be somewhat indistinct. And certainly we are aware of cases, and Duchenne is one of them, where the nub of the case is that the state officer did indeed fail to act. And this court has had many cases in the school context where you have rejected or you have affirmed the dismissal of state-created danger claims because at the heart of the matter was a failure to act. At the heart of the matter here there is an action. I'm not sure, Judge Roth, if it was you or Judge Fuentes, but at the heart of the matter, the allegation here is that Christina Regusters walked into Mr. Littlejohn's classroom, refused to identify herself, refused to show that she had any authority to have the child released to her, and he gave the child to her. That is the allegation. That affirmative act is in the nature of whether we want to use the metaphor of throwing the child into a snake pit, putting the child in the bullet's path. There are different metaphors that have been used in the case law. But fundamentally, as alleged in the complaint, what Mr. Littlejohn did was to take this little girl, a five-year-old girl, who was safely ensconced in her classroom having breakfast, and he gave her to, as it turned out, a woman who horrifically abused her and later was convicted of rape and abduction and sentenced to 40 years to life. That is a thing that he did, and that is an affirmative act, at least within the context of a motion to dismiss at the earliest stage of the case. I suppose at some point we consider the age of the child, the five-year-old child, kindergarten. Yes. What if it's a 10-year-old child? I mean, at some point, is the age of the child critical on the issue of affirmative act? Well, I'm not sure this is a complete answer to your question, but the school policy, and I'm not suggesting here that the school policy defines a constitutional duty, and for whatever reason I can't find it in my notes, the school policy was, is, certainly was at the time, that as relates to children from kindergarten, I want to say to eighth grade. Eighth grade, yes. Forgive me for just not having that off the top of my head. But there is an age range in the school policy around the concept that only certain people can release the child, and they can only release the child to a properly identified person after that identification has been checked. I suppose the younger the child, the more cautious the teachers should be with regard to people who come into the building and ask for custody. Well, I certainly agree with that, but trying to answer your question a little more fully, I don't know that there is case law within the rubric of state-created danger that has adjusted what it means to have an affirmative act or how much protection there needs to be provided to the child on the basis of the age of the child, but the school district's policy and Mr. Littlejohn's awareness of the policy, and Judge Roth, as you mentioned earlier, his failure, he did enough to demonstrate that he knew what the policy was and then actually failed to follow up with the implications of the policy. The policy in Mr. Littlejohn's failure to fully account for the policy is a backdrop against which his affirmative act took place. If we take everything that you described a moment ago about the age breakfast, the child being turned over, only five years old, into this dangerous situation, we substitute NR with Joshua, and we substitute the teacher with Child Protective Services, aren't we right back in a situation the Supreme Court has directly addressed when it comes to an affirmative act? I don't think so. I don't think so, because there is a difference between failures to act and affirmative act. Look, there are lawyers in this room, Mr. Scott, and behind me is Ms. Istvan from the city of Philadelphia, who are vigilant about following the distinction between failures to act and affirmative acts. There is, in the body of case law, in your court, just the wreckage of many lawsuits that have been stopped on the basis that at the heart of the matter is a failure, the underlying event is a failure to act rather than an act, a failure to follow up on a call from somebody who is concerned about the well-being of a child, the failure to stop bullying, the failure to stop sexual abuse, the failure to make sure that a door was closed. There are all kinds of failures that stop state-created danger claims in their tracks. This is not a failure to act. He gave the kid over to Christina Rogers. If Mr. Bill John had physically taken the child, taken him screaming, and handed the child to the perpetrator, how do you distinguish that from Child Protective Services physically returning from the safe, protected place that Joshua was in custody, returning him to his father where he was horrifically abused? And then failing to follow up on calls and concerns about the safety and well-being of the child. And in that course of conduct, if the Supreme Court didn't identify an affirmative act, how can we? Well, the answer is that there is an affirmative act here. I mean, that's just, I mean, I'm looking at the complaint, and what I'm seeing is an allegation that little John, now granted he did, I don't think the allegation is that he physically picked up NR who was screaming and yelling and gave her to Christina Rogers, but he did release her. He did instruct her that she could go, and he gave her to Rogers. So there is, again, back to the early part of our conversation, there is a continuum between act and failure to act. Perhaps in Descheny the failure to act was after the affirmative act, Well, that is true. That is true, and I think it points out that these claims are, by their nature, difficult. It is often the case, speaking as a plaintiff's counsel here, it is often the case that state-created danger claims are, with respect to affirmative act, are dancing on the edge of the table. It is, and they are difficult claims to, and I'm not sure that there has been a state-created danger claim, at least in the Eastern District of Pennsylvania, that has gone all the way through to a trial. Where that is the case, and where, as you said, it is so difficult to find cases directly on point, can you address how we then could find a clearly established right? And also, relatedly, how do we define the right here, particularly in light of our recent state-decision? Well, the state-created danger as a construct, of course, has been part of the Third Circuit's jurisprudence now for 20 years, since the Knife case. And there have been many cases that have recognized a right to bodily integrity. So now it is fair enough, true, that those cases, certainly in the school context,  But as a broad construct, the idea of state-created danger is certainly well-established. The idea of a due process right to bodily integrity is well-established. And our argument, and Judge Du Bois' explanation on the issue of clearly established, is that really when you marry those concepts, although we don't have precise factual identity, we have enough to put a teacher on notice, as it were, that to hand over a child to a complete stranger is to risk the bodily integrity of that person. I don't have a great answer, I have to acknowledge, I don't have a great answer to the question, because I don't have a case, I wish I did have a case, but I don't have a case that is really right on all fours with this one. We rejected in Spady the right of bodily integrity as being too general, a way of describing the right, and instead described it, quite fact-specifically, as a right to affirmative intervention by a state actor to minimize the risk of secondary or dry drowning. If we need to go to that level of specificity in defining the right at issue here, how could it be clearly established? If the right needs to be defined with that degree of specificity, then it may not be clearly established. That's something that I have to concede. I don't have a case that I can rely upon, that I can point to, that defines these factual parameters, or that involves these factual parameters, along the lines that you have discussed. Then let's step back to the question of whether it really does have to be defined that specifically, because we also have a state of Lugano where we said that defining something in a fact-specific way as the right of a confidential informant to nondisclosure was unduly narrow. Arguably, in the Spady case, we were addressing a right to be protected from a risk that was extremely rare and not apparent on its face, perhaps then folded into the way that right got described. But we have these two bookends of the way we have articulated what's required, one saying it can be fairly general and the other describing it in a very specific way. How can we reconcile those for proper application here? I wish I had a fast answer to that question. I think that's, I hate to say it to the judge, that's a good question, but that is... We hear it all the time. I know, that's why I hesitate to say it. So we've got to agree that's a good question. I think that's a good question. I think in the context of this case... Maybe we can use a little more information on that issue. Could we perhaps get some supplemental briefing on that? Sure. And could I trouble you to enter in a word that defines a question just so... Let's have it within ten days and no more than five pages of a letter brief. Fine, but before I leave... The exact question we're asking. Because I'm sitting here and it's easy for me to forget, so I just want to make sure I know exactly how the question is to be framed. Our argument in the current posture of the case and, as I said earlier, the way Judge Du Bois conceived it, is that when you marry the well-established proposition of state-created danger within this circuit with the numerous cases, including in the school context, around the existence of a due process right to bodily integrity, again, in the school context, is sufficient to clearly establish the right, the due process right to bodily integrity that we say was, and indeed was, violated in this case. And if the court needs to go beyond that, then of course it will, and we will be glad to file the brief that you seek. Thank you, Mr. Baker. Thank you. Mr. Scott. I just wanted to address the qualified immunity issue. In the lower court, it was conceded that there was no case on point that was identical to this, which is a Fifth Circuit case, and which the Fifth Circuit does not adopt the state-created danger, but the Fifth Circuit went through the analysis and determined that there was no underlying constitutional violation based for the reasons that we actually articulated in our brief and some of the things I said in terms of was there an affirmative act, was there action or inaction. But the reason why there really isn't clearly established law is because NIPE doesn't really apply to the facts and circumstances of this case because in NIPE, there were two adults walking home from a bar that night. But one of the adults was so drunk that she really was not in an adult stage. Well, that's actually maybe a good point here, Your Honor, and here's why. Because when Samantha and Joe were going home from the bar that night, they were encountered by an officer who believed, Mr. Tedder, Wesley Tedder, who believed that there was something going on, something criminal going on. It looked like a domestic situation to him, and so he stopped them. He actually intervened from Mr. Nipe taking his wife home, and Mr. Nipe was couched as a rescuer for Samantha because she was so intoxicated, and we know that it was below freezing. And so Mr. Tedder, Officer Tedder, he intervened, and he actually conducted a turnstile for all intents and purposes, questioned them, and separated, actually separated Mr. Nipe from Samantha and left Samantha out in the cold. That's not what happened in this case. He let a woman who did not have adult ability to walk or know what she was doing, he let her go, just as Mr. Littlejohn here, one could argue, let the child go, someone who was not able on her own to cope with being out in the environment. And the difference is that, in the environment, that was an actual known risk in front of the officer who knew exactly what the consequences were. She did fall down. Actually, it was my suffering. Your Honor, I'm sorry, a long time ago I was trial counsel in that case, and so that's why I kind of know the facts very well. But you're right, she did fall down the embankment. She walked away, she was going to the bar across the street, and she fell down the embankment. But the point is that she was just left alone to walk, and that amounted to an affirmative act. Right. And the difference between that is that Mr. Littlejohn, as alleged in paragraph 17, 18, 19, and 20, he did not intervene. He actually did nothing. He failed to do something. He failed to prevent the child from leaving. He did not intervene. And that's why there's not the clearly established kind of law that would have put Mr. Littlejohn on notice by failing to stop her, by failing to do more, would result in a constitutional violation. We're in a pleading stage, and all we have to do is take a look at the complaint, see if it plausibly pleads enough facts for the case to continue forward. And I think, Your Honor, the word that the plaintiff relies on, I'm sorry, the appellee relies on in this case, is the word released. And I think under our Supreme Court president, when we're looking at pleadings, I think the word release in this context is a legal conclusion. And I think once you remove that word released from the complaint as a legal conclusion, you're not left with anything other than Mr. Littlejohn failed to act. They used the term release as though it's affirmative, when in fact what really happened is he failed to prevent her from leaving. And maybe that's the way the case gets defined in terms of the clearly established right. How is that any more of inaction or less of an affirmative act than we had in MEEP? I mean, one can describe what was going on there as the acquiescence of one or replacement of the caretaker for someone who was obviously unable to care for themselves. And we didn't treat that as a special relationship case, that transfer of custody, if you will. We treated it as a state-created danger case. Why isn't that just as applicable here where, in a similar sense, there was custody by the teacher in a position as gatekeeper to protect these children, and then by acquiescing, turning over the custody, letting this child be put in a situation where the child no longer could be protected against foreseeable risk? We have quite the situation that we had established in MEEP. I think it's different, and I'll have to repeat myself, because it was Officer Tedder who actually inserted himself into the situation. In this, it was Mr. Boosters who inserted himself in the situation. And based on the allegations and the complaint, Mr. Littlejohn did nothing other than let it happen. But Mr. Littlejohn was put in place long before as the teacher in the classroom. And when parents release their children into the school setting for that, at least temporary, in loco parentis relationship, isn't that exactly what they're doing, letting the teacher intervene? Personally, I agree that parents should believe that their children are safe and they're not going to leave with someone who doesn't belong with them. But that is perhaps something that's in policy, and that's perhaps something that's ingrained in our personalities, but it's not something that's ingrained in the Constitution. And that's where we're looking at here. It may be a tort. It may be something that you can bring in state court, a negligence claim. But it doesn't give rise to that constitutional dynamic because of the lack of affirmative act. And Judge Fuentes in the Marra case knows his dissent was talking about inaction versus action. And it's such a fine line, you could use the word release, and that connotes custody, and therefore you let somebody go where it could mean you didn't do anything to stop the person from leaving. And so the message would be that the school teacher in this circumstance should do nothing and then they won't be responsible or liable, and I don't think that's what we want to have. And he made a mistake, and the mistake doesn't give rise to a constitutional violation. Thank you very much. Thank you. And, Mr. Becker, thank you both for your excellent arguments. Thank you. And just at the risk of badgering, will you enter something that defines the question? Yes, we will. Okay, thank you. I appreciate it. Thank you.